[No. 52133–6. En Banc. March 27, 1986.]

CHRISTINE S. STOCKER, *Individually and as Personal Representative,* ET AL, *Plaintiffs,* v. SHELL OIL COMPANY, ET AL, *Appellants,* P. M. NORTHWEST, INC., ET AL, *Respondents.*

*Bogle & Gates, Ronald T. Schaps, James H. Lowe, Angevine, Johnson & Barth,* and *Earl F. Angevine,* for appellants.

*Stafford, Frey & Mertel,* by *A. Richard Dykstra, John G. Cooper,* and *John Budlong; Twede & Rode,* by *Charles R. Twede,* for respondents.

BRACHTENBACH, J.—The issue in this case is whether the borrowed servant status of a negligent worker, assigned pursuant to a contract between a labor supplier and a labor user, may defeat an express indemnity agreement between

the contracting parties. We hold that borrowed servant status may not defeat a valid contractual indemnification agreement, and in so holding we reverse the judgment and remand.

The two parties to this appeal are Shell Oil Co. (Shell) and P. M. Northwest, Inc. (P.M.). P.M., a Washington corporation, is a labor contractor providing workers to the various oil refineries and chemical plants in the Pacific Northwest. Shell is a foreign corporation operating an oil refinery at Anacortes, in Skagit County, Washington. Shell and P.M. have had an ongoing relationship since at least 1972, whereby P.M. supplies labor and equipment on an "as-needed" basis to Shell. Their agreement is evidenced by a contract which includes a clause requiring P.M. to indemnify Shell against damage and injuries arising out of performance of the contract, including injuries suffered or caused by either Shell or P.M. employees. Excluded is indemnification for Shell's *sole* negligence.

Pursuant to this contract, Shell regularly employed P.M. laborers to work at the Shell refinery. On June 9, 1979, Shell requested four P.M. pipefitters to perform maintenance on the refinery furnaces. While one of these pipefitters, Robert Cloquet, was working on a line to a furnace, a gasket ruptured and a great volume of hydrocarbon escaped. The hydrocarbon ignited, causing an explosion and fire. Cloquet escaped injury, but two of the other pipefitters, Ed Stocker and Earl Stanek, were killed.

The personal representatives of Stocker and Stanek sued Shell. Shell eventually settled both claims for a total of $1,808,106.80.[1] After paying the entire settlement amount, Shell sued P.M. for indemnification. Shell based its argument for indemnity on the notion that the fire resulted, in whole or in part, from the negligence of Robert Cloquet, who was a general employee of P.M. Since Cloquet had been supplied to Shell pursuant to the Shell/P.M. contract, and injuries arising from performance of the contract were

---

[1]None of the claimants in those actions is a party to the present appeal.

to be borne by P.M. under the indemnity agreement, P.M. was liable to Shell.

The action for indemnification was tried separately and to a jury. The jury returned a general verdict in favor of P.M., and judgment was entered on that verdict. Shell, citing trial errors, moved for a new trial or judgment n.o.v. The motion was denied, and Shell appealed the judgment, asking for reversal and remand with instructions that "borrowed servant" is not a defense to P.M.'s liability under the indemnification agreement.

The borrowed servant defense is a legal fiction, long recognized in Washington, which expands the concept of respondeat superior. Under the rule of respondeat superior, an employer is vicariously liable to third parties for his servant's torts committed within the scope of employment. Restatement (Second) of Agency § 219, at 481 (1958). An employer, however, may loan his servant to another employer. When a servant's general employer loans his servant to the borrowing, or "special" employer, the servant then becomes the "borrowed servant" of the special employer to perform a particular transaction. *Macale v. Lynch,* 110 Wash. 444, 448, 188 P. 517 (1920). *See also American Sign & Indicator Corp. v. State,* 93 Wn.2d 427, 433, 610 P.2d 353 (1980). If it can be established that the servant had borrowed servant status at the time of performance of such transaction, the servant's general employer can escape liability for damage or injuries flowing from the transaction. *See Davis v. Early Constr. Co.,* 63 Wn.2d 252, 386 P.2d 958 (1963).

The borrowed servant defense has arisen in a variety of contexts. Its most common modern use is as a sword or a shield to circumvent workmen's compensation laws. *See, e.g., Davis v. Early Constr. Co., supra; Pichler v. Pacific Mechanical Constructors,* 1 Wn. App. 447, 462 P.2d 960 (1969); *Smick v. Burnup & Sims,* 35 Wn. App. 276, 666 P.2d 926 (1983). In the instant case, P.M. is using the defense to circumvent liability under an express indemnity agreement.

Indemnity agreements are essentially agreements for contractual contribution, whereby one tortfeasor, against whom damages in favor of an injured party have been assessed, may look to another for reimbursement. *Redford v. Seattle,* 94 Wn.2d 198, 615 P.2d 1285 (1980). Such agreements are generally enforceable in Washington; however, limits have been placed on their enforcement by both the courts and the Legislature. We have said that such agreements must be between competent equal bargainers. *Redford,* at 206. They must be in writing. *Glass v. Stahl Specialty Co.,* 97 Wn.2d 880, 652 P.2d 948 (1982). To be enforceable against the indemnitor for actions brought by its own employees, an indemnity agreement must contain express language to that effect. *Brown v. Prime Constr. Co.,* 102 Wn.2d 235, 239, 684 P.2d 73 (1984). Indemnification agreements purporting to indemnify an indemnitee for his sole negligence are not favored and are to be clearly drawn and strictly construed, with doubts to be settled in favor of the indemnitor. *Jones v. Strom Constr. Co.,* 84 Wn.2d 518, 527 P.2d 1115 (1974); *Accord, Brame v. St. Regis Paper Co.,* 97 Wn.2d 748, 649 P.2d 836 (1982). Additionally, the Legislature, in RCW 4.24.115, decreed that indemnification agreements in construction/maintenance contracts may not indemnify the indemnitee for his sole negligence.

Where the foregoing limits have not been exceeded, this court has consistently enforced properly drafted indemnification agreements, *Brown,* at 238, "unless prohibited by statute or public policy." *Northwest Airlines v. Hughes Air Corp.,* 104 Wn.2d 152, 154, 702 P.2d 1192 (1985). The indemnification clause in the instant case in no way exceeds these limits and is unquestionably enforceable.

 Given that the contractual indemnity agreement in this case is enforceable, and that a borrowed servant defense is generally maintainable, what is the result when these contract and tort concepts clash? We hold that an express contractual agreement for indemnification must prevail over the tort defense of "borrowed servant".

In *Cope v. J.K. Campbell & Assocs.,* 71 Wn.2d 453, 429

P.2d 124 (1967), we held that a common law prohibition against a right of contribution between joint tortfeasors could not defeat an express indemnity agreement. The *Cope* court, at page 455, found the case turned on "matters of contract and not of tort". Similarly, the instant case turns on the expressed contractual intent of Shell and P.M. that P.M. indemnify Shell for claims arising from Shell's "borrowing" of servants from P.M. It is manifestly clear to us that such "borrowing" and "loaning" of "servants" is the essence of the Shell/P.M. contract. Moreover, indemnification for damage caused or claimed by these "borrowed servants" is the precise purpose of the indemnity clause.

Other jurisdictions considering this issue have all upheld the indemnity agreements. We found the rationale in *Hull v. Chevron U.S.A., Inc.*, 602 F. Supp. 75 (D. Wyo. 1985) to be particularly persuasive. In *Hull*, on facts similar to those in the instant case, the United States District Court for Wyoming upheld an indemnity clause against a borrowed servant defense. The *Hull* court cited several policy reasons to support its holding. First, if a negligent servant's liability is always to be imputed to an indemnitee, rather than an indemnitor, the latter would never have to pay. Second, to allow such a result would frustrate the reasonable expectations of the contracting parties and thus interfere with their freedom to contract. Finally, such a result would be unfair, because the labor supplier expressly contracted to indemnify the oil company against all claims resulting from the negligent acts of the labor supplier's general employees. *Hull*, at 77.

Results similar to those in *Hull* were also reached in *Tidewater Oil Co. v. Travelers Ins. Co.*, 468 F.2d 985 (5th Cir. 1972). In *Tidewater*, the court held that the furnished worker is, under traditional tests, a borrowed servant. However, regular users and suppliers of contract labor can allocate the risk of those servants' negligence through indemnity agreements. *Accord, Elston v. Shell Oil Co.*, 376 F. Supp. 968 (E.D. La. 1973), (affirmed without opinion, 495 F.2d 1371 (5th Cir. 1974)) (contract supplier of labor

held liable under an express contractual indemnity agreement, notwithstanding the borrowed servant status of the negligent laborer supplied to the indemnitee). *See also Amoco Prod. Co. v. W.C. Church Welding & Contracting, Inc.,* 580 P.2d 697 (Alaska 1978); *Burgess Constr. Co. v. State,* 614 P.2d 1380 (Alaska 1980).

We are persuaded that public policy considerations mandate enforcement of indemnity agreements, notwithstanding incidents of borrowed servant status. For us to hold otherwise would frustrate the clearly expressed intent of the parties and allow a patently unfair result. Accordingly, we vacate judgment against Shell.

Since this record does not establish whose negligence, if any, caused the explosion and fire, we cannot make a final determination of liability. Therefore, we remand for proceedings not inconsistent with this opinion.

DOLLIVER, C.J., and UTTER, DORE, PEARSON, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

Reconsideration denied July 29, 1986.